IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

James T. Conway, III, et al.,

    Plaintiffs,

v.

Reginald Wilkinson, et al.,

    Defendants.

Case No. 2:05cv820

Judge Michael H. Watson

## OPINION AND ORDER

In this prisoner civil rights case, plaintiff James T. Conway III and various members of his family assert that their constitutional rights are being violated by the visitation policy in place at the Ohio State Penitentiary located in Youngstown, Ohio. Mr. Conway, who is on death row, asserts that the current practice of allowing death row inmates only non-contact visits, which take place in a small room without restroom facilities, violates his and his family members' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Mr. Conway originally requested a temporary restraining order and a preliminary injunction to prevent his transfer to the Youngstown facility while this case was under advisement. At the time he made that request, death row prisoners were housed in Mansfield. The Court denied injunctive relief and the transfer appears to have occurred, because in an amended complaint which he seeks to file, Mr. Conway details the visitation conditions that exist at Youngstown.

This case has not yet been screened under 28 U.S.C. §1915A, which is applicable to prisoner-initiated litigation, nor have the non-prisoner plaintiffs made

service on any of the defendants. However, the Ohio Department of Rehabilitation and Correction (ODRC) has filed a motion to dismiss. The Court will conduct the required screening in conjunction with ruling on the motion to dismiss.

I.

The Court turns first to the motion for leave to amend. Since no responsive pleading has ever been filed, Mr. Conway would ordinarily have the right to file an amended complaint once as a matter of course. Fed.R.Civ.P. 15(a). That rule may not strictly apply to prisoner litigants who seek, by amendment, to cure deficiencies in the initial complaint. McGore v. Wrigglesworth, 114 F.3d 601 (6th Cir. 1997). As more fully discussed below, it appears that the purpose of the amended complaint is not to cure any deficiencies in the original complaint, but to reflect the fact that Mr. Conway is now an inmate at the Youngstown institution and to name the warden of that institution and the new director of the ODRC as defendants. Further, the McGore rule would not apply to the non-prisoner plaintiffs. For these reasons, the motion to amend (#17) is GRANTED, and the Clerk is directed to detach and file the amended complaint attached to the motion. The Court now turns to the motion to dismiss, which is directed at the amended complaint.

II.

ODRC first argues that the case should be dismissed for failure to exhaust available administrative remedies. It contends that the initial complaint was deficient under Brown v. Toombs, 139 F.3d 1102 (6th Cir. 1998), a case which held that prisoners must plead and prove exhaustion of administrative remedies as part of the pleading process in order to satisfy the exhaustion requirements of the Prison Litigation Reform

Act found at 42 U.S.C. §1997e(a). Relying on McGore v. Wrigglesworth, 114 F.3d 601 (6th Cir. 1997), the ODRC asserts that even though the proposed amended complaint indicates that appropriate administrative remedies have now been exhausted, a prisoner may not use an amended complaint to remedy defects in the original complaint.

Brown v. Toombs is no longer good law. See Jones v. Bock, ___ U.S. ___, 127 S.Ct. 910 (2007). Based on Jones, the Court concludes that the initial complaint was not defective for failure to allege and prove exhaustion of administrative remedies because such allegations and proof are not required either by the PLRA or the Federal Rules of Civil Procedure. That being so, the amended complaint does not represent an attempt to "cure" a deficiency in the original complaint, and the rule in McGore is therefore not violated here. Further, the amended complaint is more correctly characterized as a supplemental complaint because it contains allegations concerning matters which occurred subsequent to the filing of the original complaint. See Fed.R.Civ.P. 15(d). The Court does not read McGore to preclude the filing of a supplemental complaint which, among other things, describes the prisoner's efforts at exhaustion, at least under circumstances where the initial complaint would not have been dismissed on exhaustion grounds. ODRC appears to concede that the amended complaint adequately alleges exhaustion, and even if it did not, Jones v. Bock would not permit the Court to dismiss that complaint on exhaustion grounds. Consequently, ODRC's first argument in favor of dismissal lacks merit.

III.

Next, ODRC argues that the amended complaint should be dismissed because it fails to state a claim upon which relief can be granted. That argument is evaluated under the following standard.

A motion to dismiss attacks the sufficiency of the complaint. In ruling upon such a motion, the Court must accept as true all well-pleaded allegations of the complaint, and may dismiss the action only if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. Conley v. Gibson, 355 U.S. 41 (1957). Pro se complaints are to be construed liberally in favor of the pro se party. Haines v. Kerner, 404 U.S. 519 (1972). Because the Court's inquiry under 28 U.S.C. §1915A, which requires an initial screening of a prisoner complaint even where, as here, the entire filing fee has been paid, also relates to whether the complaint fails to state a claim upon which relief can be granted, the Court will simultaneously rule on this portion of the motion to dismiss and conduct the required screening.

The complaint alleges that the rights of both Mr. Conway and his family are violated by the visitation policy in effect at the OSP. The plaintiffs contend that a liberty interest in contact visitation is being infringed, that the conditions violate Mr. Conway's right to be free from cruel and unusual punishment, and that the Equal Protection Clause of the Fourteenth Amendment is violated by the prison's decision to allow other inmates, including those who are a higher security risk than death row inmates, to have full contact visits. The complaint appears to allege both that the restrictions imposed upon death row inmates' visitation are irrational and cannot be supported by any valid penological interest.

As the Court reads the motion to dismiss, it attacks the sufficiency of the complaint's due process and equal protection allegations on a single ground: that prison inmates have no right to "unfettered visitation" (Motion to Dismiss, at 6, quoting Thornburgh v. Abbott, 490 U.S. 401, 460 (1989)) and therefore any prison regulation that restricts visitation in any way is beyond the reach of the Constitution. Although acknowledging that the Equal Protection claim is subject to "rational basis" analysis, see Reply Memorandum, at 3, quoting Hampton v. Hobbs, 106 F.3d 1281 (6th Cir. 1997), ODRC does not argue or articulate any rational basis for treating death row inmates less favorably than high-risk maximum security inmates. Further, ODRC does not argue that the restrictions it imposes on death row inmates are rationally related to a legitimate penological interest and are therefore constitutional under the test laid out in Turner v. Safley, 482 U.S. 79 (1987). Thus, it appears that the only question raised by the motion to dismiss is whether an inmate has any interest in visitation, no matter how minimal, that might, under the right circumstances, enjoy a measure of protection under the Due Process or Equal Protection Clauses.

The Supreme Court has strongly implied that a case involving inmate visitation cannot be summarily dismissed simply because inmates have no visitation rights that might fall within the Constitution's ambit. In Overton v. Bazzetta, 539 U.S. 126, 131 (2003), the Court, while upholding certain restrictions on inmate visitation under the Turner v. Safley standard, noted in *dictum* (that is, in a comment that was not strictly necessary in order to explain the court's decision) that "we do not hold, and we do not imply, that any right to inmate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners." However, in its opinion issued after

remand, the Court of Appeals for the Sixth Circuit dismissed the plaintiffs' claim that a liberty interest in some level of prison visitation could be found in the Fourteenth Amendment, stating that "[w]e know of no circuit court that has found an implicit due process right to prison visitation." Bazzetta v. McGinnis, 430 F.3d 795, 804 (2005). Indeed, there do not appear to be any such decisions, and there are various District Court decisions directly holding that all inmate visitation is a privilege, not a right, so that even if prisons denied inmates all visitation for the entire length of their incarceration, no constitutional interest would be implicated. See, e.g., Cooper v Garcia, 55 F.Supp.2d 1090 (S.D.Cal. 1999); see also Brown v. Day, 1999 WL 816378 (E.D. La. 1999). Other courts have held that while a total ban on prison visits might run afoul of the Constitution (which, according to those courts, has long been recognized to provide a measure of protection to familial association), once a prison determines that such visits will be allowed, any restrictions or inconveniences imposed on those visits do not implicate Constitutional concerns. See, e.g., Leslie v. Sullivan, 2000 WL 34227530 (W.D. Wis. Nov. 13, 2000).

To be sure, there are decisions which imply that restrictions on prison visitation, especially with family members, may well implicate a constitutionally-protected liberty interest, and that an analysis of the reasonable nature of such restrictions under the Turner v. Safley test is therefore required. See, e.g., Navin v. Iowa Dept. of Corr., 843 F.Supp. 500, 502 (N.D. Iowa 1994)("[p]rohibitions on visits by inmates' children are generally disfavored .... Such rules potentially violate both the First Amendment rights of association of both inmate-parent and the child as well as their due process right of personal privacy in activities relating to family relationships"). Given the *dictum* quoted

above from Overton v. Bazzetta, this approach seems more in keeping with the notion that prisoners do retain a modicum of First Amendment rights, including associational rights, and that those rights may be circumscribed by prison regulations only if those regulations meet some minimal level of rationality. However, in light of the Sixth Circuit's decision in Bazzetta v. McGinnis, this Court is constrained to hold that prison visitation is not a liberty interest which can be derived from the Fourteenth Amendment and which enjoys constitutional protection. Thus, Mr. Conway cannot prevail on his due process claim, because he simply has no protected liberty interest in being able to visit his family at all, let alone an interest in having the visit conducted under less restrictive circumstances than are presently allowed.

This analysis does not completely address Mr. Conway's equal protection claim. As noted above, ODRC argues (correctly) that since prisoners are not a "suspect class" for equal protection purposes, and because no fundamental right is implicated by restrictions on inmate visitation, the differences between the way death row and other inmates are allowed to have visitation are constitutionally permissible if there is a rational basis for the distinction which the prison has made between those two types of inmates. However, ODRC has not articulated any such rational basis in its motion to dismiss. Because the Court is required to screen the complaint to determine if it states a viable constitutional claim, however, it must examine independently whether Mr. Conway could ultimately prove an equal protection violation based on the facts set forth in the complaint.

Mr. Conway contends that the difference in visitation procedures is irrational for several reasons. He notes that the ODRC has planned on several occasions to

construct facilities that would permit death row inmates to have contact visits, but cancelled those plans for reasons unrelated to any security risks that such visits might pose. He also notes that, as a group, death row inmates pose less of a security risk than certain other types of prisoners, such as maximum security inmates, but that those prisoners are permitted to have contact visits. For purposes of this analysis, the Court must assume that these facts are true. The question then becomes whether these facts would support a finding that no rational basis exists for restricting death row inmates from having visitation privileges similar to those afforded to other inmates.

It is well-settled that prison authorities have broad discretion in determining how to manage the prison population. Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119 (1977). The courts have been extremely reluctant to second-guess the way in which that discretion is exercised. In language that is applicable to this case, the Court of Appeals held that the refusal to grant a hearing to an inmate before isolating him from the general prison population based on his gang affiliation, while providing a hearing to other types of prisoners, did not violate the Equal Protection Clause: "Because the state is not obligated to provide such a hearing, the fact that it offers one for some prison classifications but not for others is of no federal constitutional consequence so long as the choice is not an arbitrary one." Harbin-Bey v. Rutter, 420 F.3d 571, 576-77 (6th Cir. 2005). It is also true that differences in the way that the state treats various groups of its citizens do not have to be precisely tailored to the differences involved: "[A] State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." Dandridge v. Williams, 397 U.S. 471, 485 (1970).

Here, it may well be that the OSP could manage the security concerns posed by allowing contact visits for death row inmates, but that does not make its choice not to do so in the context of the facilities presently existing at the institution an irrational one. Further, although there may be some death row inmates who pose less of a security risk than some inmates who are allowed contact visits, it is again not irrational for prison officials to conclude that the security risks inherently posed by those with the most severe sentences counsel against allowing those inmates the same privileges that are afforded to others. See, e.g., Jeffries v. Reed, 631 F.Supp. 1212, 1218 (E.D. Wash. 1986)(upholding a prison regulation restricting contact between death row and general population inmates against an equal protection challenge, and noting that "defendants acted reasonably in restricting contact between Death Row inmates and other prisoners as a means of providing the heightened security required in light of plaintiff's [death] sentence"). In other words, there is at least some relationship between the fact that an inmate is subject to a death sentence and the decision to treat that inmate differently than a general population inmate for visitation purposes. Whether the prison's decision in that area is ideal or even wise is not the question presented to the Court. See Heller v. Doe by Doe, 509 U.S. 312, 319 (1993) ("rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness or logic of legislative choices,'" quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993). Consequently, the Court concludes that the complaint does not state a viable equal protection claim.

Mr. Conway's Eighth Amendment claim requires little discussion. As far as the Court is aware, no case has held that restricting a prisoner either to non-contact or

limited contact visits violates that amendment's ban on cruel and unusual punishment. See, e.g., Caldwell v. Miller, 790 F.2d 589, 601 n.6 (7th Cir. 1986), citing Block v. Rutherford, 468 U.S. 576 (1984); cf. Rico v. Conner, 146 Fed.Appx. 249 (10th Cir. 2005)(five-year ban on all visitation did not violate the Eighth Amendment). If lengthy bans on all visiting privilege are not inconsistent with the "evolving standards of decency" applicable to prisoners' Eighth Amendment claims, see Rhodes v. Chapman, 452 U.S. 337 (1980), limiting prisoners to no-contact or limited contact visits are clearly not violations of that amendment.

IV.

Having concluded that Mr. Conway has not stated any claims upon which relief can be granted, the only other issue presented is whether the other plaintiffs, members of his family, have stated a claim on their own behalf. ODRC's motion phrases this question in terms of standing, and argues that the family members lack standing because they are asserting only rights which, if they exist, belong to Mr. Conway. In response, the family members argue that they have asserted their own associational rights, and that they are suing for the deprivation of those rights.

The concept of standing is frequently confused with the question of whether a particular plaintiff has stated a claim upon which relief can be granted. There is certainly language in various Supreme Court opinions which fosters this confusion. For example, in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992), in a passage quoted in the ODRC's motion to dismiss, the Court stated that in order to have standing, a plaintiff must have suffered an "injury in fact," which purportedly requires the "invasion of a legally protected interest...." Such language appears to require the Court,

as part of the standing inquiry, to decide if the interest claimed by the plaintiff is one which the law protects, so that in a constitutional case such as this one, the Court would have to resolve the question of whether the constitutional right asserted by the plaintiff actually exists before it can determine if the plaintiff has the right to litigate the merits of that question.

In fact, the "injury in fact" prong of the traditional three-part standing inquiry derived from such decisions as Allen v. Wright, 468 U.S. 737 (1984), does not require the Court to determine if the plaintiff has asserted a proper claim for denial of a constitutional right before granting the plaintiff standing to argue for the existence of that right. It only requires that the plaintiff assert that he or she, personally, has suffered an injury to an interest that, if the law ultimately recognizes it as valid (which may well be the merits inquiry involved in the case), is the type of interest which the courts have historically protected, rather than some abstract interest (such as the "right" to have the government act lawfully or to have tax dollars spent lawfully) which cannot be secured through judicial decision-making.

There is no question that the courts have historically considered an injury to associational rights protected by the First Amendment to be the type of injury that satisfies the first prong of the Allen v. Wright test. Courts have routinely found standing to sue for a denial of associational rights when it is clear that a decision in the plaintiff's favor would provide the plaintiff with a tangible benefit (i.e. an increase in the amount of association which the plaintiff claims to have been deprived of) even if the merits of the underlying question - namely, whether the plaintiff is actually entitled to that relief on grounds that the government's current policy of restricting or preventing the association

in question is unlawful - are debatable. See, e.g., Ukranian-American Bar Ass'n v. Baker, 893 F.2d 1374 (D.C. Cir. 1990) (finding that bar association had standing to seek relief from alleged governmental policy of denying their members access to persons from the Ukraine who might seek political asylum in the United States). Consequently, the Court concludes that the plaintiff family members have, for standing purposes, adequately alleged a violation of their own First Amendment rights, and it now turns to the question of whether they have stated a claim upon which relief can be granted. The answer to that question depends upon whether the courts have construed the First Amendment right to association to cover family members who seek to visit an imprisoned relative.

There is no question that the constitution protects certain aspects of the ability of a family to associate, and that this protection includes not only spouses and children but other relatives as well. See, e.g. Moore v. City of East Cleveland, 431 U.S. 494(1977) (holding that matters of choice in family life are protected by the Due Process Clause of the Fourteenth Amendment). However, this right is severely limited in the context of associating with a family member who is serving a prison sentence. In fact, the Court of Appeals has suggested that the right of the non-prisoner family member to associate with the inmate "is no greater than the right of the prisoner[] with whom they wish to associate." Akers v. McGinnis, 352 F.3d 1030, 1047 (6th Cir. 2003). Otherwise, prisoners would be able to gain greater privileges than they are otherwise entitled to simply by having a non-prisoner family member assert an independent entitlement to that privilege.

This Court agrees that Mr. Conway's family members do not possess any greater rights to associate with Mr. Conway than he does to associate with them. The Court has held, in this Opinion and Order, that the restrictions at issue in this case do not violate Mr. Conway's constitutional rights. That being so, they also do not violate his family's rights, and they have therefore failed to state a claim upon which relief can be granted.

V.

As noted in Section I, the Court GRANTS the motion for leave to amend (#17) and the Clerk shall file the amended complaint. Further, for the foregoing reasons, the motion of defendant ODRC to dismiss (#19) is GRANTED. This case is dismissed pursuant to 28 U.S.C. §1915A and Fed.R.Civ.P. 12(b)(6). The Clerk is directed to enter judgment in favor of the defendants.

/s/ Michael H. Watson
Michael H. Watson, Judge
United States District Court